588 N.W.2d 813 (1999)
256 Neb. 73
Robert L. DAILY, appellee,
v.
BOARD OF EDUCATION OF MORRILL COUNTY SCHOOL DISTRICT NO. 62-0063, also known as School District of Bridgeport, appellant.
No. S-97-933.
Supreme Court of Nebraska.
February 5, 1999.
*816 Richard A. Douglas, of Nichols, Douglas, Kelly, and Meade, Scottsbluff, for appellant.
Mark D. McGuire, of McGuire & Norby, Lincoln, for appellee.
HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

I. INTRODUCTION
The Legislature, in 1988, mandated that "[c]orporal punishment shall be prohibited in public schools." Neb.Rev.Stat. § 79-295 (Reissue 1996). In the context of a disputed teacher-discipline case, we must determine whether "corporal punishment" is a term that is commonly used and understood, such that a person of ordinary sensibilities and intelligence should be capable of ascertaining its meaning and abiding by its proscriptions. For the reasons that follow, we determine that "corporal punishment" is a term that is commonly understood to be the infliction of bodily pain as a penalty for disapproved behavior and that there was sufficient evidence as a matter of law to support the decision of the board of education of Morrill County School District No. 62-0063, also known as School District of Bridgeport (the District), to discipline Robert L. Daily for corporally punishing a seventh grade student. We, therefore, reverse the judgment of the district court and remand the cause with directions as set forth herein.

II. FACTUAL BACKGROUND
Daily, the plaintiff-in-error in the district court and the appellee in this court, has been a teacher with the District for over 32 years. Daily's performance evaluations indicate that he has been a competent and effective teacher during those years.
On December 12, 1996, Daily was involved in an incident in which he allegedly struck a seventh grade student, identified as K.P. On January 6, 1997, Daily received a letter from Lewis Shoff, superintendent of the Bridgeport Public Schools, notifying Daily that Shoff had determined, because of the incident, that it might be appropriate to cancel Daily's contract. Daily responded, through counsel, that he was requesting a hearing before the board pursuant to "Neb.Rev.Stat. §§ 79-12,107 through 79-12,121 (Reissue 1994)." A subsequent notice by the District advised Daily that the superintendent would not only recommend the cancellation of his contract, but also recommend that the board consider the possible amendment of Daily's contract to include, but not be limited to, suspension without pay or a written reprimand. Based upon such notice, a hearing was held on January 26 at the Bridgeport Public High School.
The evidence adduced at the hearing showed that on December 12, 1996, Daily kept two students in his classroom after his third-period class. Daily testified that the two seventh graders, K.P. and W.R., had been disrupting the class. Daily specifically testified that W.R. had been talking to another student during class and that K.P. had been attempting to draw attention to himself by flexing his muscles for the class. Daily testified that during the detention, after talking with W.R. about his misbehavior, Daily turned to K.P. to talk about what K.P. had done during class.
The events that followed were disputed. Daily testified that as Daily tried to talk to K.P., K.P. turned away from Daily toward W.R. and again flexed his muscles, evidently in an attempt to draw W.R.'s attention. Daily then, by his testimony, "tapped" K.P. on the head "to get his attention." Daily testified that K.P. responded by saying, "You hit me," and then tried to get up out of his seat. *817 Daily, by his own account, grabbed K.P. by the shoulders and made K.P. remain in the seat. Daily then said, "[K.P.], I didn't hurt you." Daily testified that K.P. then asked if they could go to the office. Daily said that he agreed and that they began to walk toward the door. Daily then, by his account, turned back toward W.R., and K.P. turned away from the door and returned to his seat. Daily specifically denied blocking K.P.'s path to the door. Daily said that he then dismissed the students. Daily testified that he followed K.P. to the locker area to try to talk to him, but that K.P. was unresponsive. Daily said he then returned to his classroom.
Daily also admitted that in "tapping" K.P., he had been acting out of frustration. Daily denied, however, any intent to injure K.P. and stated that his action had been involuntary in that he had acted "without even thinking about it." Daily admitted that in his opinion, he should not have touched K.P.
W.R.'s testimony at the board hearing gave a slightly different version of events. W.R.'s testimony is similar to Daily's until the point when Daily turned his attention to K.P. At that point, W.R. testified that Daily "smacked" K.P. with his open hand on the back of K.P.'s head. W.R. said that K.P. then began to cry. According to W.R., K.P. tried to leave, but Daily said, "[K.P.], sit back down," and Daily then grabbed K.P. and "had to kind of fight him to get him back to his seat." W.R. testified that Daily then said, "Oh, I barely tapped you," to which K.P. replied, "Well, you're not supposed to hit a child anyways." W.R. also testified that Daily had not blocked K.P.'s route to the door.
The only other eyewitness to the incident to testify at the board hearing was Bill Alvarez, a junior high school math teacher and 31-year employee of the District. Alvarez occupied the classroom next to Daily's. Alvarez testified that at the time of the incident, he was standing out in the hall to monitor students during the time between classes. Alvarez saw a group of students standing outside Daily's classroom, waiting for Daily to finish talking to W.R. and K.P. so the students could enter the classroom for their next class. Alvarez walked up next to one of the students who was looking inside the classroom through the glass window in the classroom door. Alvarez testified that although he could not hear what was occurring inside, he "caught the tail end where [Daily] tapped [K.P.] on the head and then he, you know, grabbed him by the arm...."
Alvarez also testified that one "J.D." was one of the students standing outside the door, closer to the window than Alvarez himself had been. An eyewitness account written by J.D. was offered into evidence, but was not accepted into evidence by the hearing officer. This account was largely consistent with W.R.'s account, but additionally related that according to J.D., Daily had stood in front of the classroom door to prevent K.P. from leaving. Also offered but not accepted into evidence was K.P.'s written account of the incident. K.P.'s account was consistent with W.R.'s, except that K.P. professed ignorance of what had prompted Daily to strike him and K.P. also stated that Daily later "would not let [him] out the door." J.D. and K.P. did not testify at the hearing. Written statements by W.R., Daily, and Alvarez were accepted into evidence; these accounts were consistent with their testimony at the hearing.
Also testifying at the hearing for the District were Steve Jones, the secondary principal of the Bridgeport Public Schools, and Shoff, the superintendent for the District.
Jones testified regarding his investigation of the December 12, 1996, incident. Jones testified that he was called into the guidance counselor's office, where K.P. told him what had happened. Jones' testimony regarding K.P.'s statements was accepted by the hearing officer, not for the truth asserted by the statements but as part of the investigation by Jones that led to disciplinary action against Daily.
Jones testified that K.P. was disheveled and looked upset and that he reported he had been struck in Daily's class. Jones further testified that he observed "considerable redness" on K.P.'s shoulder and arm where K.P. reported that Daily had grabbed him. Jones then obtained a written statement from K.P. and proceeded to interview and *818 obtain written statements from W.R., J.D., and Alvarez.
Jones stated that he then spoke to Daily and asked him to make a written statement. Jones testified that Daily said, during the December 12, 1996, interview, that Daily had "lost his temper, lost control," and admitted to striking K.P. and to restraining K.P. by holding K.P.'s arms. Daily, by Jones' account, admitted to acting from frustration and conceded that he should not have touched K.P. Jones testified that Daily also said that he had not intended to hurt K.P. and that striking K.P. was "an involuntary reaction."
Jones was cross-examined by Daily's counsel regarding the general definition of corporal punishment. Jones testified that he believed "any discipline that uses force is corporal punishment" and that losing one's temper and hitting a student should also be regarded as corporal punishment. Shoff testified that he believed corporal punishment was "the use of physical force."
Shoff also testified about his part in the investigation that led to disciplinary action against Daily. Shoff testified that after reading the written statements obtained by Jones, Shoff decided to suspend Daily without pay. Shoff testified that he was told by K.P.'s mother that K.P. had a headache and upset stomach after he came home from school on December 12, 1996. Shoff said that after his review of the incident, he concluded that Daily should be fired for using corporal punishment.
Daily called, as his first witness, Ardis Kisner, a fellow teacher for the District. Daily attempted to adduce evidence that K.P. had spoken to Kisner a couple of months before the incident and had said, "We're going to get Mr. Daily fired." A hearsay objection to this testimony was sustained by the hearing officer, and an offer of proof was made by Daily outside the presence of the school board.
Daily then called the mother of C.H., a student at Bridgeport Junior High. C.H.'s mother testified that on the day after the incident, she answered a telephone call at her home from K.P., who wanted to speak to C.H. C.H.'s mother testified that she told C.H. to pick up the telephone in the bedroom and that when she went back into her kitchen to hang up the telephone she had initially answered, she overheard a part of the conversation taking place between K.P. and C.H.
C.H.'s mother testified that K.P. told C.H. that Daily had hit K.P. the previous day. C.H.'s mother testified that when she picked up the phone, she heard K.P. say, "[C.H.], I got Mr. Daily in trouble." When C.H. asked what happened, K.P. reportedly said, "[W.R.] and I got in trouble, Mr. Daily had us stay after class and then he hit me." According to C.H.'s mother, C.H. asked K.P. if Daily had hurt him, and K.P. replied, "No, he just bopped me on the head but I made it sound like he did." C.H.'s mother said she then went to the bedroom and told C.H. to hang up the telephone. This testimony was received into evidence over objection.
Daily also presented the testimony of the school nurse for the Bridgeport Public Schools, who was one of J.D.'s parents and herself a former student of Daily's. The school nurse testified generally about Daily's teaching skills. She also testified that her son J.D. claimed to have observed the December 12, 1996, incident and that J.D. had told her that Daily struck K.P. "to get his attention." A fellow teacher also testified to Daily's good character and skill as a teacher.
Daily's last witness, before his own testimony, was Peg Person, another teacher for the District. Person testified at length regarding the "Boys Town Model" of discipline, her training in that model, and her frustrations regarding the discipline policy at the Bridgeport Junior High School.
After the hearing, the board moved to a closed session to deliberate. Thereafter, the board, in open session, found that
based solely upon the evidence at this formal due process hearing held on January 23[sic], 1997, that the actions of Robert L. Daily on December 12, 1996, were clearly inappropriate. The Board of Education further finds that the use of physical force out of frustration to strike [K.P.] on the head and restraining him by holding his arms constitute just cause within the meaning of 79-12,112 and 79-12,107 (3) *819 and are in violation of 79-4,140; and thereby constitute insubordination and unprofessional conduct.
As a result of these findings the Board of Education amends the contract of Robert L. Daily to provide for a suspension without pay for 30 working days and a requirement that he obtain adequate professional counseling.
Daily filed a petition in error in the district court, and after hearing, the district court entered a judgment in which it found that there was sufficient evidence as a matter of law to show that Daily "tapped a student," K.P., on the back of the head and "held his arm so that Daily could talk to [him] about his classroom behavior." The district court found that these actions did not constitute a third degree assault, nor did they constitute corporal punishment, and that they "did not constitute insubordination or unprofessional conduct under the circumstances of this case."
The district court further found that hearsay evidence had been introduced at the hearing by the District and that "it must be assumed that the Board of Education erroneously relied upon such evidence to support its findings." The court found that "`just cause'" was lacking and that there was "not sufficient evidence as a matter of law to support the decision of the Board of Education."
The District timely appealed, and upon Daily's notice that the case challenged the constitutionality of a statute, we removed the case to the Supreme Court docket in compliance with Neb.Rev.Stat. § 24-1106(1) (Reissue 1995).

III. ASSIGNMENTS OF ERROR
The District assigns that the district court erred in (1) using an improper standard of review, (2) making a determination that the board did not rely on competent evidence, (3) making findings of fact contrary to those of the board, (4) determining that the board relied solely on hearsay evidence, (5) finding that "`just cause'" was necessary in order to sustain the board's findings, (6) not finding sufficient evidence as a matter of law to sustain the board's decision, (7) ordering the board to pay Daily in full and overruling the requirement for counseling, (8) making a decision contrary to the law and unsupported by the evidence, and (9) not finding the appeal frivolous and not awarding attorney fees and costs to the board.
Daily did not cross-appeal, but in his brief, Daily asserts as he did in the district court that (1) the District lacked the statutory authority to unilaterally order him to seek counseling, (2) § 79-295 is unconstitutionally vague, and (3) there was insufficient evidence, as a matter of law, to sustain the findings of the board.

IV. STANDARD OF REVIEW
This court has not directly addressed an error proceeding from a school board ruling in which a teacher's employment was not terminated, but was instead subjected to some lesser disciplinary action. Consequently, there is no prior case establishing a standard of review in such a situation. The parties submit, and we agree, that the standard of review for an error proceeding in a teacher employment-termination case would be appropriately applied to a teacher-discipline case.
We hold, therefore, that the standard of review in a proceeding in error from an order of a school board subjecting a teacher to disciplinary action is whether the school board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision. See, Boss v. Fillmore Cty. Sch. Dist. No. 19, 251 Neb. 669, 559 N.W.2d 448 (1997); Drain v. Board of Ed. of Frontier Cty., 244 Neb. 551, 508 N.W.2d 255 (1993). The evidence is sufficient as a matter of law if the school board could reasonably find the facts as it did on the basis of the testimony and exhibits contained in the record before it. Id. "`[T]he evidence is "substantial" or "sufficient as a matter of law," or constitutes "some competent evidence," if a judge could not, were the trial to a jury, direct a verdict....'" Boss v. Fillmore Cty. Sch. Dist. No. 19, 251 Neb. at 676, 559 N.W.2d at 453 (quoting Eshom v. Board of Ed. of Sch. Dist. No. 54, 219 Neb. 467, 364 N.W.2d 7 (1985)).

*820 V. ANALYSIS

1. BOARD DETERMINATION
The District's first, second, third, sixth, seventh, and eighth assignments of error all generally advance the same argument: The board's decision was supported by the evidence, and the district court erred by not affirming it.
The basis for the board's order, as contained in its findings, was that Daily's actions constituted "just cause within the meaning of 79-12,112 and 79-12,107 (3) and are in violation of 79-4,140; and thereby constitute insubordination and unprofessional conduct." We must therefore examine those statutes and our prior cases governing unprofessional conduct or insubordination to determine if there was competent evidence presented at the hearing that would support the board's findings.
The "79-12,107" referred to by the board was codified as Neb.Rev.Stat. § 79-824 (Reissue 1996) effective July 19, 1996. Section 79-824(4) provides, in relevant part, that "[j]ust cause means: (a) Incompetency ... (b) neglect of duty; (c) unprofessional conduct; (d) insubordination; (e) immorality; (f) physical or mental incapacity; (g) failure to give evidence of professional growth ... (h) other conduct which interferes substantially with the continued performance of duties."
Section 79-12,112 was codified as Neb.Rev. Stat. § 79-829 (Reissue 1996) effective July 19, 1996, which provides, in relevant part, that "[t]he school board by a vote of the majority of its members may determine that such permanent certificated employee's contract shall be amended or terminated for any of the following reasons: (1) Just cause as defined in section 79-824."

(a) Corporal Punishment
Section 79-4,140, codified as § 79-295, effective July 19, 1996, simply states that "[c]orporal punishment shall be prohibited in public schools."
The Nebraska statutes do not define the term "corporal punishment." The primary effect of § 79-4,140, now § 79-295, was to partially repeal Neb.Rev.Stat. § 28-1413 (Reissue 1985), which had provided in part:
The use of force upon or toward the person of another is justifiable if:
....
... The actor is a teacher or a person otherwise entrusted with the care or supervision for a special purpose of a minor and:
... [t]he actor believes that the force used is necessary to further such special purpose, including the maintenance of reasonable discipline in a school, class or other group, and that the use of such force is consistent with the welfare of the minor[.]
This statute essentially stated the commonlaw rule regarding corporal punishment, as it existed in the state before the adoption of § 79-4,140, now § 79-295. See Cornhusker Christian Ch. Home v. Dept. of Soc. Servs., 227 Neb. 94, 416 N.W.2d 551 (1987).
A brief examination of the legislative history of § 79-4,140, now § 79-295, helps shape our analytical framework. Section 79-4,140 was adopted in 1988 as an amendment to L.B. 316, which added to that bill the full text of what had previously been L.B. 955. The record of the Judiciary Committee hearing on L.B. 955 contains the following exchange:
SENATOR [JERRY] CONWAY: I was just going to ask you, is corporal punishment that particular term, defined some... in the statutes elsewhere; or did you purposely not define it or?
SENATOR [ERNIE] CHAMBERS: It's a term that is so well known in terms of its meaning. There have been court cases dealing with this subject that it doesn't require a definition.
Judiciary Committee Hearing, L.B. 955, 90th Leg., 2d Sess. 7 (January 29, 1988).
While it is true that there have been court cases defining corporal punishment, none of those cases have been decided in Nebraska. Most cases from other jurisdictions, in fact, define corporal punishment in the context of statutes that permit "reasonable" corporal punishment. This provides definitions that delineate the line between "reasonable" and "unreasonable" corporal punishment, but are of little guidance in determining what is and is not corporal punishment.
*821 Generally, however, corporal punishment is reasonably understood to be the infliction of bodily pain as a penalty for disapproved behavior. See, e.g., Nadine Block and Robert Fathman, Convincing State Legislatures to Ban Corporal Punishment, 9 Children's Legal Rts. J. 3:21 (1988). Both words of the term "corporal punishment" are commonly given effectthe act must be "corporal," in that it inflicts pain on the physical body of the victim, and it must be "punishment," such that the intent of the actor is punitive. The interpretation of corporal punishment includes not only striking, but any action which seeks to induce bodily pain, for example, forcing a student to stand on tiptoes with fingertips outstretched against the wall or to crouch and bend over and remain in cramped, painful positions for a long time. See id.
Most statutes from other jurisdictions that ban corporal punishment effectively include the same elements as set forth above. See, e.g., Conn. Gen.Stat. Ann. § 53a-18 (West 1994); Mass. Gen. Laws Ann. ch. 71, § 37G (West 1996); Nev.Rev.Stat. § 392.465 (1997); N.J. Stat. Ann. § 18A:6-1 (West 1989).
Other state statutes contain those elements, but also have exceptions that provide, generally, for use of physical contact to maintain order and control. For instance, Wisconsin law provides that corporal punishment does not include "[u]sing incidental, minor or reasonable physical contact designed to maintain order and control." Wis. Stat. Ann. § 118.31(2)(h) (West 1991). See, also, e.g., Cal. Educ.Code § 44807 (West 1993); Mont. Code. Ann. § 20-4-302 (1997); Va.Code Ann. § 22.1-279.1 (Michie 1997).
Nebraska statutes do not deal with this issue in the specific context of corporal punishment. The Legislature has provided, however, that "[a]dministrative and teaching personnel may take actions regarding student behavior, other than those specifically provided in the Student Discipline Act, which are reasonably necessary to aid the student, further school purposes, or prevent interference with the educational process." Neb. Rev.Stat. § 79-258 (Reissue 1996).
We determine that § 79-258, while obviously not authorizing corporal punishment, does provide authority for school teachers and administrators to use physical contact short of corporal punishment to the degree necessary to preserve order and control in the school environment. Moreover, the statute authorizes an acceptable level of incidental physical contact, as is necessary for teachers to promote personal interaction with their students. A certain amount of incidental physical contact is virtually unavoidable for people working together in a social environment.
The key distinction between such reasonable and necessary physical contact and "corporal punishment," as commonly understood and prohibited by statute, is to be found in the elements set forth above. Contact that does not cause pain is simply not corporal punishment. Corporal punishment also does not include physical contact that is not intended to punish a student for disapproved behavior but is instead intended to preserve order in the schools or intended to protect persons or property from harm.
Other jurisdictions, in addressing the issue of corporal punishment, have consistently focused on the punitive intent of the teacher. In Daniels v. Gordon, 232 Ga.App. 811, 503 S.E.2d 72 (1998), the appellate court found that a teacher had grasped a student's face and turned the student's head to face her. The court found that "not all physical contact instigated by an educator amounts to corporal punishment." Id. at ___, 503 S.E.2d at 75. The court found that "[i]n this case, [the teacher's] actions were instituted to regain control and supervise the classroom.... [Her] uncontroverted testimony established that her grasping of [the student's] face was meant to get [his] attention and not to punish." (Citation omitted.) Id. Consequently, the court found that the teacher's actions did not constitute "corporal punishment" under Georgia law. Id.
Similarly, a Florida appellate court found that physical contact with students did not constitute "corporal punishment" where the contact was intended not to punish, but simply to restore order in the classroom. Williams v. Cotton, 346 So.2d 1039 (Fla. App.1977), cert. denied 354 So.2d 988. The *822 Florida court found that a Florida statute requiring teachers to "`keep good order' in [the] classroom necessarily implies the power to the teacher to use reasonable physical force [not amounting to corporal punishment] to do so." Id. at 1041. The court found that "[w]ithout such reasonably implied power, the requirement to `keep good order' would be meaningless." Id.
Where the circumstances indicate a punitive intent, however, courts have found corporal punishment. In People v. McMillan, 45 Cal.App.2d Supp. 821, 114 P.2d 440 (1941), the court found that a supervisor in a juvenile facility had committed corporal punishment when he slapped a student. Although the defendant argued that he was merely attempting to preserve order, the court found in the record "evidence tending to show ... that such force as defendant used was applied just after the objects of it had violated some rule of the institution and apparently for the purpose of punishing them for the violation and not to prevent one." Id. at 827, 114 P.2d at 444.
Under similar circumstances, a Pennsylvania court found that a teacher who slapped a student on the face had committed corporal punishment. Harris v. Commonwealth Secretary of Ed., 29 Pa. Cmwlth. 625, 372 A.2d 953 (1977). The court said that "[t]his Court does not consider slapping fourth graders on the face on [sic] attention getting device. Considering the circumstances of the incident, this Court finds that [the teacher] did administer corporal punishment to [the student]." Id. at 632, 372 A.2d at 956. The court found, however, that the same teacher had not committed corporal punishment in touching a student to remove a pencil from his hand. Id.
Having reviewed and considered the relevant Nebraska statutes, as well as decisions from other jurisdictions, we hold that corporal punishment, as prohibited in § 79-295, is reasonably understood to be the infliction of bodily pain as a penalty for disapproved behavior. One of Daily's arguments in the district court, and preserved in his brief on appeal, was that § 79-295 is void for vagueness, thereby denying Daily his procedural due process rights under article I, § 3, of the Nebraska Constitution and the 14th Amendment to the Constitution of the United States. The district court, because of its resolution of the case, had no cause to consider Daily's constitutional claim. For the sake of completeness, we find it necessary to address Daily's vagueness claim.
Daily presents a facial challenge to the constitutionality of § 79-295, claiming that the use of the term "corporal punishment" does not provide adequate notice to teachers as to what conduct is prohibited or provide adequate standards to prevent arbitrary enforcement by school boards. It is axiomatic that statutes are afforded a presumption of constitutionality, and the unconstitutionality of a statute must be clearly established before it will be declared void. Kwik Shop v. City of Lincoln, 243 Neb. 178, 498 N.W.2d 102 (1993). Even when a law is constitutionally suspect, a court will attempt to interpret that law in a manner such that it is consistent with the Constitution. Id. The burden of establishing the unconstitutionality of a statute is on the one attacking the statute's validity. Id.
When a legislative enactment is challenged on vagueness grounds, the issue is whether the two requirements of procedural due process are met: (1) adequate notice to citizens and (2) adequate standards to prevent arbitrary enforcement. Id.; City of Lincoln v. ABC Books, Inc., 238 Neb. 378, 470 N.W.2d 760 (1991) (citing Kolender v. Lawson, 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983)). In other words, due process requires that an enactment supply (1) a person of ordinary intelligence a reasonable opportunity to know what is prohibited and (2) explicit standards for those who apply it. Kwik Shop v. City of Lincoln, supra; City of Lincoln v. ABC Books, Inc., supra (citing Grayned v. City of Rockford, 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972)).
A statute will not be deemed vague if it uses ordinary terms which find adequate interpretation in common usage and understanding....
... The prohibition against vagueness does not invalidate a statute simply because it could have been drafted with *823 greater precision. The test is whether the defendant could reasonably understand that his conduct was proscribed by the statute.
State v. Sprague, 213 Neb. 581, 587-88, 330 N.W.2d 739, 744 (1983).
The U.S. Supreme Court has held:
[The] prohibition against excessive vagueness does not invalidate every statute which a reviewing court believes could have been drafted with greater precision. Many statutes will have some inherent vagueness, for "[i]n most English words and phrases there lurk uncertainties." ... Even trained lawyers may find it necessary to consult legal dictionaries, treatises, and judicial opinions before they may say with any certainty what some statutes may compel or forbid.
(Citation omitted.) Rose v. Locke, 423 U.S. 48, 49-50, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975).
While § 79-295 could have been drafted with greater precision, "we can never expect mathematical certainty from our language." Grayned v. City of Rockford, 408 U.S. at 110. In State v. Rogers, 44 Ohio App.2d 289, 337 N.E.2d 791 (1975), an Ohio appellate court rejected a vagueness challenge to a corporal punishment statute. In that case, the defendant teacher challenged the vagueness of the term "corporal punishment," as applied by the Ohio trial court to her alleged abuse of a pupil. The court found that the use of the term did not make the statute "unconstitutionally vague or overbroad since a person of ordinary sensibilities and intelligence should be capable of ascertaining its meaning and abiding by its proscriptions." Id. at 291, 337 N.E.2d at 793. Likewise, we conclude that a person of ordinary sensibilities and intelligence should be capable of ascertaining the generally understood meaning of corporal punishment and abide by the statute's proscriptions. Daily's void for vagueness challenge to § 79-295 is without merit.

(b) Sufficiency of Evidence
Having held that corporal punishment is reasonably understood to be the infliction of bodily pain as a penalty for disapproved behavior, we must next consider whether the board acted within its jurisdiction and whether there is sufficient evidence as a matter of law to support its decision.
We have held that the evidence is "sufficient as a matter of law" if a judge could not, were the trial to a jury, direct a verdict. Boss v. Fillmore Cty. Sch. Dist. No. 19, 251 Neb. 669, 559 N.W.2d 448 (1997). It is something less than the weight of the evidence and can be such as to permit the drawing of two inconsistent conclusions. Stephens v. Board of Ed. of Sch. Dist. No. 5, 230 Neb. 38, 429 N.W.2d 722 (1988); Eshom v. Board of Ed. of Sch. Dist. No. 54, 219 Neb. 467, 364 N.W.2d 7 (1985). In order to support a school board decision, the record must be such that on the basis of all the testimony and exhibits, the school board could fairly and reasonably find the facts as it did. See Eshom v. Board of Ed. of Sch. Dist. No. 54, supra.
The standard of review is crucial to our disposition of the instant case. What some witnesses characterized as a "tap" on the student's head "to get [the student's] attention," other witnesses described as a "smack" on the back of the student's head (hard enough to make the student cry) after the teacher had "lost his temper, lost control." The board heard and observed the testimony of numerous witnesses, on both sides of the issue, before finding that Daily's "use of physical force out of frustration to strike [K.P.] on the head and restraining him by holding his arms" were "clearly inappropriate." The board had to make crucial credibility determinations, and the board obviously accepted one version of the facts rather than another on the critical issues in dispute. Rather than determining whether the board "could fairly and reasonably find the facts as it did," id. at 471, 364 N.W.2d at 11, and reviewing the record to ascertain whether there is evidence "`sufficient as a matter of law,'" id., to support the board's decision, the district court conducted what more closely resembled a de novo review, substituting its own inferences for the findings and conclusions of the board. In doing so, the district court erred.
In our review of the record to determine whether the board "could fairly and reasonably *824 find the facts as it did," id., presuming the testimony of W.R. to be true, as we must, there was sufficient evidence to conclude that Daily "smacked" K.P. on the head, hard enough to make K.P. cry. This physical contact was not necessary to control the classroom or to prevent misbehavior, but was instead initiated responsively after K.P.'s misbehavior. Daily himself admitted that his actions were based on his frustration with K.P.'s disobedience. The characterization of the physical contact contained in W.R.'s testimony is not that of a "tap" on the head, but is instead a description of a blow that inflicted pain on K.P. Jones testified that K.P. was disheveled and looked upset when K.P. reported that he had been struck in Daily's class. In short, W.R.'s description of the incident does not relate the use of physical contact as an attention-getting device, but instead depicts the infliction of physical discomfort on K.P. as a penalty for K.P.'s disapproved behavior.
Regarding Daily's restraint of K.P., however, the facts do not support a finding of corporal punishment. The uncontroverted facts regarding this portion of the incident show that Daily's intent was to preserve order by returning K.P. to his seat and preventing him from leaving the room prematurely. Under § 79-258, Daily was authorized to take actions that were reasonably necessary to further school purposes and prevent interference with the educational process. Therefore, we conclude that on the basis of all the testimony and exhibits, the board could have "fairly and reasonably" concluded that Daily had committed the act of corporal punishment, as prohibited by § 79-295, when Daily struck K.P. on the back of the head on December 12, 1996.

(c) Unprofessional Conduct
Having found that there was sufficient evidence as a matter of law to support the board's finding of corporal punishment, we must now decide whether such a finding may constitute "unprofessional conduct" under § 79-824.
Unprofessional conduct is not defined in § 79-824. In construing the statute at issue in this case, however, this court has held that unprofessional conduct must be conduct directly related to the fitness of the actor to act in his or her professional capacity. Boss v. Fillmore Cty. Sch. Dist. No. 19, 251 Neb. 669, 559 N.W.2d 448 (1997).
It is well established in several other jurisdictions that "unprofessional conduct" is that conduct which breaches the rules or ethical code of a profession or conduct which is unbecoming a member in good standing of a profession. See, e.g., Board of Education v. Swan, 41 Cal.2d 546, 261 P.2d 261 (1953), cert. denied 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1954), overruled on other grounds, Bekiaris v. Board of Education, 6 Cal.3d 575, 493 P.2d 480, 100 Cal.Rptr. 16 (1972); In re Alschuler, 388 Ill. 492, 58 N.E.2d 563 (1944); Morris v. Clarksville-Montgomery, 867 S.W.2d 324 (Tenn.App. 1993); Shea v. Board of Medical Examiners, 81 Cal.App.3d 564, 146 Cal.Rptr. 653 (1978); Pierstorff v. Board of Embalmers, 68 Ohio App. 453, 41 N.E.2d 889 (1941), appeal dismissed, 138 Ohio St. 626, 37 N.E.2d 545. See, also, generally, 68 Am.Jur.2d Schools § 161 (1993 & Supp.1998). This working definition is sensible, and we adopt the definition for use in teacher-discipline cases.
While the ethical rules of the teaching profession are not in the record, it is clear that the "rules" of the profession must necessarily encompass the statutes enacted by the Legislature to govern the conduct of teachers in the public schools. Furthermore, the violation of a state statute prohibiting the use of corporal punishment in public schools constitutes conduct that is unbecoming a member of the teaching profession. The infliction of corporal punishment by a teacher on a student is clearly conduct directly related to the fitness of that teacher to act in his or her professional capacity.
Accordingly, we conclude that the use of corporal punishment by a teacher, in violation of § 79-295, may subject the teacher to discipline for unprofessional conduct under § 79-824. Since we have already concluded that the board's findings regarding corporal punishment in this case were supported by the evidence, we also conclude that the board's decision regarding unprofessional conduct is supported by the evidence. The *825 district court's findings to the contrary constitute reversible error.
Because the board's findings regarding corporal punishment and unprofessional conduct were supported by the evidence, an evaluation of Daily's alleged insubordination is unnecessary to our disposition of the case; therefore, we will not consider the insubordination issue.

(d) Amendment of Contract
Finally, Daily asserts that the board lacked the statutory authority to unilaterally order Daily to "obtain adequate professional counseling" as a part of the amendment to his teaching contract.
Neb.Rev.Stat. § 79-826 (Reissue 1996) provides in relevant part:
The superintendent or the superintendent's designee may take action with regard to a certificated employee's performance or conduct which is deemed reasonably necessary to assist the certificated employee and further school purposes, including: (1) Counseling; (2) oral reprimand; (3) written reprimand; and (4) suspension without pay for not to exceed thirty working days.
....
Prior to taking any action under subdivision (4) of this section, the certificated employee shall be advised in writing of the alleged reasons for the proposed action and provided the opportunity to present the certificated employee's version of the facts.
The board's power to order additional sanctions is set forth and limited by Neb. Rev.Stat. § 79-836 (Reissue 1996), in part, as follows:
(1) After providing the opportunity for a hearing on cancellation, termination, or nonrenewal as provided for in sections 79-828, 79-829, and 79-832, and except when reduction in force is the reason given for possible termination, and when just cause can be shown, the school board may impose such other sanctions, other than termination, cancellation, or nonrenewal of the contract, as may be agreed upon by the parties.
Daily claims that the record is devoid of any agreement by Daily that he "obtain adequate professional counseling." While there may be certain additional or extraordinary sanctions that call for an agreement by the parties, a school district has the authority, pursuant to § 79-826, to suspend a certificated employee without pay for up to 30 working days and to order counseling which is deemed reasonably necessary to assist the employee and further school purposes, so long as the statutory notice and hearing requirements are met.
In the instant case, Daily received all necessary notice and due process before his contract was amended, pursuant to § 79-826; however, that portion of the board's order requiring that Daily "obtain adequate professional counseling" is so vague as to be virtually unenforceable. Without a minimum of objective standards setting forth the duration of the counseling, or the payment provisions or nature of the mandatory counseling, this portion of the order is subject to the most arbitrary kind of enforcement by the board.
Therefore, upon remand, the district court shall be directed to strike that portion of the board's order which amended Daily's contract to provide that he "obtain adequate professional counseling." In all other respects, the final order of the board amending Daily's contract is proper and within the board's jurisdiction to act.

2. RELIANCE ON HEARSAY EVIDENCE
The district court based its decision, in part, on its assumption that the board erroneously relied on hearsay evidence in making its determination. The District claims that the district court erred in this assumption, and we find it necessary to briefly address the assigned error because our sufficiency of the evidence determination is based on a review of the properly admitted testimony and exhibits.
Daily's argument to the district court on this point was based on Hollingsworth v. Board of Education, 208 Neb. 350, 303 N.W.2d 506 (1981). In that case, we held: "Although strict adherence to the rules of evidence cannot be demanded or even expected *826 at a hearing before a school board, when a teacher's career hangs in the balance, the basic principles of due process demand that hearsay statements of students be given little, if any, weight." Id. at 360, 303 N.W.2d at 512.
In this case, presumably, the district court was referring to the statements of K.P. and J.D., who did not testify at the hearing. The written statements of the two boys, however, were not accepted into evidence, and there is no evidence that they were considered by the board. The most questionable hearsay evidence admitted at the hearing, in fact, was offered by Daily, through the testimony of C.H.'s mother regarding statements made by K.P. that C.H.'s mother overheard.
Furthermore, there is no indication in the findings of the board that the hearsay evidence, if considered, was given more than the "little, if any, weight" accorded to such evidence under Hollingsworth v. Board of Education, supra. The statements of J.D. and K.P. were almost entirely cumulative, as the facts asserted by J.D. and K.P. were also contained in the testimony of W.R., Alvarez, and Daily himself. The only fact unique to J.D.'s and K.P.'s accounts is the allegation that Daily prevented K.P. from leaving the room after K.P. was struck, and this allegation is entirely unnecessary to support the board's finding of corporal punishment.
Thus, there is no basis to conclude that the board erroneously relied upon hearsay evidence to support its findings in violation of Daily's due process rights.

3. ATTORNEY FEES
The only other assignment of error that we must address is the District's claim that the district court erred in not finding Daily's appeal to be frivolous.
Attorney fees can be awarded, of course, against a party bringing an appeal that is without rational argument based on law and evidence. See, Neb.Rev.Stat. § 25-824.01 (Reissue 1995); U S West Communications v. Taborski, 253 Neb. 770, 572 N.W.2d 81 (1998); Surratt v. Watts Trucking, 249 Neb. 35, 541 N.W.2d 41 (1995); First Nat. Bank in Morrill v. Union Ins. Co., 246 Neb. 636, 522 N.W.2d 168 (1994). The term "frivolous," as used in Neb.Rev. Stat. § 25-824(2) (Reissue 1995), connotes an improper motive or legal position so wholly without merit as to be ridiculous. Behrens v. American Stores Packing Co., 236 Neb. 279, 460 N.W.2d 671 (1990); Peterson v. Don Peterson & Assoc. Ins. Agency, 234 Neb. 651, 452 N.W.2d 517 (1990). Any doubt whether a legal position is frivolous or taken in bad faith should be resolved in favor of the one whose legal position is in question. Surratt v. Watts Trucking, supra.
While Daily has only partially prevailed in this appeal, we conclude that significant issues have been addressed and that Daily's petition in error in the district court was certainly not frivolous. The fact that Daily prevailed in the district court is ample evidence of that fact. This assignment of error is wholly without merit.

VI. CONCLUSION
Based upon the foregoing analysis, we conclude that the board's findings regarding corporal punishment in this case were supported by the evidence and that the use of corporal punishment by a teacher, in violation of § 79-295, may subject the teacher to discipline for unprofessional conduct under § 79-824. Therefore, we reverse the judgment of the district court and remand this cause to the district court with directions to strike that portion of the board's order which amended Daily's contract to provide that he "obtain adequate professional counseling"; in all other respects, the order of the board amending the contract of Robert L. Daily, including the suspension without pay for 30 working days, shall be affirmed.
REVERSED AND REMANDED WITH DIRECTIONS.